Howard, J.
On January 14, 1894, at the town of Winchester, the apppellee’s decedent, a fireman on appellant’s engine No. 383, was killed by the collapse of said engine. In this action ' appellee has sought to recover damages for the death of his decedent, alleging that the same was caused by the negligence of the appellant. The jury returned a general verdict for the appellee, answering also certain interrogatories propounded to them. On this appeal, *255 it is contended by the appellant that the court- erred in overruling the motion for a new trial.
One cause assigned in favor of the motion for a new trial is, that the court erred in refusing to give instruction numbered 14, as requested by the appellant. There are several reasons why the question so raised 'cannot be considered. In the first place, as said in Puett v. Beard, 86 Ind. 104, “It does not appear that the instruction was asked at a proper time.” It should be shown affirmatively that the request was made in due season, that is at or immediately after the close of the evidence. Section 542, Burns’ R. S. 1894 (533, R. S. 1881); Evansville, etc., R. R. Co. v Crist, 116 Ind. 446.
Neither does it appear that all the instructions are in the record; and it must be presumed that the instruction refused, if a correct one, was embodied in some other instruction given. Puett v. Beard, supra. Finally, it is not disclosed by the record whether the instructions were ever filed, as required by the statute above cited. ' Except when instructions are brought into the record by bill of exceptions, it should affirmatively appear that they have been filed. Blount v. Rick, 107 Ind. 238; Fort Wayne, etc., R. W. Co. v. Beyerle, 110 Ind. 100; Ohio, etc., R. W. Co. v. Dunn, 138 Ind. 18.
The main contention of appellant is that the verdict is not supported by the evidence.
Engine No. 383, the collapse of which caused the death of appellee’s decedent, was purchased by appellant from reputable builders in 1887, and was repaired in appellant’s shops in 1891, the fire box being in part renewed and new stay-bolts being put in in place of those found broken. In April, 1893, nine months be *256 fore the accident, the engine was subjected to a hydraulic test.
After the collapse of the engine it was found that 47 of the 600, or over, stay-bolts used to hold together the outer and inner sheets of the fire-box were broken. The broken bolts were clustered together, in a square, or nearly so, close to the center and on the right side of the fire-box; and the sheet on this side was forced inward.
It would appear to have been the rule of the company to have the stay-bolts inspected as often as once a week, to discover whether any were burnt out or broken by the contraction and expansion of the inner and outer sheets of the fire-box. The test used by appellant to learn the condition of the stay-bolts is what is called the hammer test. The heads only of the bolts can be seen from the fire-box, and it is agreed that the hammer test is the best and only practicable means, and the one in general use on all railroads, to learn the condition of the part of the stay-bolts concealed between the two sheets of the fire-box.
To make the hammer test, the inspector, after the engine has cooled, enters the fire-box, carrying a torch and hammer, and taps the head of each stay-bolt, and is thus enabled, by the sound, or, as it is also claimed, by feeling the vibrations of the sheet with one hand, to tell whether the bolt is whole or broken. If, however, the bolt is freshly broken between the sheets, and the broken ends still fit close to each other, it is admitted that it may be more difficult to tell by the hammer whether the bolt is yet whole or not. No better test, though, is known, save taking the fire-box apart, which is agreed to be impracticable for ordinary and usual testing.
The last hammer test of the stay-bolts in this case was made January 11,1894, three days before the dis *257 aster; and the dispute between counsel is, whether the test then made was a reasonably careful one, or, rather, whether there was competent and sufficient evidence from which the jury might, as they did, infer that the test made was not a reasonably careful one.
An examination was also made on the morning of the day of the accident, by merely looking into the firebox; but it is evident that but little reliance could be placed on this examination as to the condition of the stay-bolts, only the heads of which could be seen by looking into the fire-box.
Counsel for appellant admit, that it is the employer’s duty to make reasonably careful inspection; but they contend, that if reasonable„care is used in selecting inspectors, and if the inspection is made in the usual manner, there is no breach of duty, and therefore no liability, even though it is discovered after the accident, that defects existed. They say, further, that the burden is on the plaintiff to establish negligence, and that he cannot establish negligencé except by showing the inspector’s incompetency, or by showing that there was not, in fact, a reasonably careful inspection made.' There can be no doubt that these last two propositions are correct statements of the law.
The jury find that the inspector was incompetent; but, without considering whether that finding is supported by the evidence, it may be said that the important question here is, whether there was competent and sufficient evidence to prove, or from which the jury might infer, that, on January 11, 1894, the inspection made was not a reasonably careful inspection, and such as the appellant was in duty bound to make; for, even if the inspector were competent, yet if the inspection made by him were not a reasonably careful one, or one such as is usually made by reasonably care *258 ful and competent- inspectors, the appellant would still be liable.
The inspection of the stay-bolts of engine No. 383, made on the night of January 'll, 1894, was by Ezra L. Lepper, a boiler maker long in the service of appellant. Taking appellant’s evidence alone, and it appears quite satisfactorily that the inspector was competent; nor is this evidence directly controverted, and, if controverted at all, it is only by inference from his own and other testimony. Mr. Lepper had no personal recollection of having made the inspection, and depended for his knowledge wholly upon the report made by him. This report, signed by him, showed that on January 11,1894, all the stay-bolts had been examined and none found broken. After the accident the condition of the fire-box and stay-bolts was examined by several skilled persons, machinists, engine and boiler makers, firemen, engineers and others, and from the evidence of these men we are of opinion that the jury might conclude that the report made by the inspector was incorrect, that many of the stay-bolts must have been broken at the time they were reported sound by him.
John Fitzmorris, a machinist of fifteen years’ experience in repairing and working on boilers, took a light and examined the fire-box immediately after the collapse. He found the right side outer sheet of the firebox torn off and thrown over toward the left, with 47 of the stay-bolts broken in two, some of the broken parts clinging to the outer sheet, and some to the inner. The space covered by the broken bolts “formed a square,” some running up from the square “into a kind of neck.” They were all “near the center of the fire-sheet.” This witness further testified that of the 47 broken bolts there were seven or eight along the bottom “that looked like they had been broken off for *259 some time; that is, the ends of them were smooth like they had come together.” The ends of the more recently broken bolts were not smooth, but of a “ragged appearance.” The bolts that had been broken off for sometime “were in a bunch,” or “were all in one square.” He also testified that the breaking of one stay-bolt would weaken the others around it, put more strain on the stay-bolts next to it, and that after the seven or eight worn stay-bolts were broken the engine would not be safe.
William Fitzmorris, a machinist and engine builder of many years’ experience, a very intelligent witness, gave much evidence of a similar character. He discovered some stay-bolts that “appeared to have been broken for some time, could not say how long, and then all around them were considerable more.” The bolts that appeared to have been broken for some time were “slick where the two ends work together. The end of it was worn smooth. The fibre was all worn off of it; where on the others that had recently broke off the fibre was still on the stay-bolt, that is, the ragged and sharp edges to them. They were broken for some time. It was worn smooth. There were none of those ragged edges.” He also testified that if one stay-bolt was broken it would throw greater pressure upon the adjacent bolts; that if five or six stay-bolts were broken the fire-sheet “would be in bad shape,” and that if seven or eight bolts were broken near together the engine “would not be safe,” that “it would make it in a very bad condition.” This witness also noticed that it did not seem that the stay-bolts broke that way at once, “some wear more than others.” The ends might wear smooth by the vibration of the side sheets in two or three days, and it might take a month.
James M. Riehert, a locomotive fireman, looked into the fire-box on the day after the accident. He testified *260 that the bottom row of stay-bolts on the right side, also the top row and part of the one next to it, seemed to have been recently broken; the other rows showed “appearance as though they had been broken off some time;” the “appearance was corroded with scales,” “scales and mud.” The bottom and upper rows where broken “showed bright;” the others, in his opinion, “had been broken and separated some time before the explosion.” As to whether an engine with stay-bolts so broken off and corroded for such length of time would be sqfe, he replied, “she was not, according to my judgment.”
William Garstein, superintendent of motive power for the appellant railroad system, said that if one stay-bolt was broken it would increase the pressure on each of the surrounding bolts, and as more bolts were broken the pressure on the remaining bolts would continue to increase.
Thomas A. Lewis, mechanical engineer of the appellant company, in answer to the question as to whether an engine is safe to run with broken stay-bolts, said: “They are safe to run if not too many of them are broken.” He also' said that if one stay-bolt were broken the added pressure on the others would render them more liable to be broken, and the more that were broken the more likely the remainder were to be broken.
We think this evidence must have caused the jury to question, very seriously, whether a careful examination had been made by the inspector; Lepper, on the night of January 11¿ 1894, three days before the collapse of the engine. It was the province of the jury to weigh the conflicting evidence; and, if they were of opinion, after considering all the evidence, that Lepper had not, in fact, made such careful examination, but that seven or eight of the stay-bolts had been *261 broken for some time when his report showed them to be sound, we cannot disturb their finding. Lepper, himself, does not remember making this inspection, but goes by his report. If he actually sounded each bolt in the inspection made that night, it would seem that he must have discovered at least some of the broken bolts, but his report shows them all unbroken. About a month after the disaster the company had Lepper examined as to his ability to detect broken stay-bolts by the hammer test, and he found them all. He could, consequently, hardly have missed all, had he made a careful inspection just a month previous.
The jury not only found a general verdict for appellee, but they found specially that at the inspection made on January 11, 1894, the fire-box and stay-bolts were not found to be sound or in good condition. We think the record shows competent and sufficient evidence to support the finding so made.
In a late Michigan case, Woods v. Chicago, etc., R. W. Co., 66 N. W. 328, there was, as in this case, evidence that a number of broken stay-bolts were worn smooth, that the process of wearing smooth requires some time, that by the hammer test 90 per cent, of all broken bolts could be discovered, and that the bolts break gradually. The court held that from this evidence the jury might find that in an inspection made by the hammer test fourteen days before the accident, the company was negligent. The court also held that a person who had been a locomotive engineer for fourteen years, who had known stay-bolts to break, and seen them taken off, and who had been in machine shops a good deal, might testify as to whether broken stay-bolts which he had examined were recently broken or not.
• A s to the conflict of evidence in that case, which is *262 similar to the conflict in the case at bar, the court there said: “We think, in view of this testimony, and the testimony which tended to show that a large number of the stay bolts were broken a sufficient length of time before the injury so that their ends had become worn smooth, and that the process of wearing them smooth must have been very slow, according to any theory, and in view of the fact that the testimony shows that these bolts break gradually, it became a question for the jury whether the witnesses. Hunter and Kelly, made a proper hammer test at the time stated. If their testimony could not be disputed in the manner adopted in this case, it follows that, however incredible the surroundings may make their testimony that they performed their full duty, their testimony must be accepted as true.” See, also, Fuller v. Jewett, 80 N. Y. 46; Indiana, etc., R. W. Co. v. Snyder, 140 Ind. 647.
At the test made of appellant’s inspectors, in February after the accident, Mr. Lepper, the night inspector, was found to have made a perfect inspection, having then, by the hammer test, discovered all the broken bolts in the engine examined. At the same Februhry inspection, the day inspector discovered all but one Of the broken bolts in an engine then examined by him; and he was therefore said to have proved himself a fairly good inspector. In the Michigan case cited, it was shown that in a reasonably careful inspection, “90 per cent., at least, of the broken stay bolts would be discovered by the hammer inspection.” There was, in the case at bar, competent evidence given from which it might be concluded that, at the time when the inspection was made of engine 383, seven or eight stay-bolts were actually broken. The evidence also authorized the conclusion that, had a reasonably careful test been then made, almost all of *263 the broken bolts, according to the Michigan case 90 per cent, of them, would then have been discovered. The inspector, however, reported none of them broken. The jury were, therefore, justified in finding that a reasonably careful inspection had not beep made on the night of January 11, 1894. If the evidence given by the report alone should control, then it would follow that no matter how inefficient an examination had been made, yet this report could not be contradicted, but it must be taken for granted that, an inspection by the hammer having been shown, the inference would necessarily follow that a reasonably careful inspection had been made. This cannot be the law.
The jury, therefore, having weighed the evidence, and there being competent and sufficient evidence to sustain their verdict, we cannot disturb it.
Judgment affirmed.
Monks, J., took no part in the decision of this case.