## O'CONNOR v. ARMOUR PACKING CO.

(Circuit Court of Appeals, Fifth Circuit. January 7, 1908.)

No. 1,697.

1. NEGLIGENCE—TRIAL—QUESTIONS OF LAW OR FACT.

The question of negligence is generally for the jury; and it is only when the evidence is without material conflict, and is such that all reasonable men must draw the same conclusion from it, that the question is for the court.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Negligence, §§ 279–302.]

2. MASTER AND SERVANT—INJURY TO SERVANT—EXPOSURE TO INFECTIOUS DISEASE.

It is the duty of a master to exercise reasonable care to protect his servants from exposure to contagious or infectious disease while in the performance of their work, and such duty, like that to provide a reasonably safe place and appliances, is absolute, and cannot be delegated. If it requires an inspection, it is not performed by employing competent and skilled inspectors, but there must be, in fact, a reasonably careful and skillful inspection, and the master is responsible for an injury to a serv-

158 F.—16

ant from a cause which such an inspection would have discovered and removed.

3. SAME—DUTY OF INSPECTION.

    The inspection of cattle and meats at packing houses by the government under the federal statutes is for the purpose of preventing traffic in diseased and unwholesome meats, and does not relieve a corporation engaged in slaughtering cattle from the duty of exercising reasonable care to see that its employés engaged in handling its meats are not exposed to infectious diseases. If it relies on the government inspection, it is responsible to its servants in that regard for the efficiency of such inspection.

4. SAME—ACTIONS FOR INJURY TO SERVANT—QUESTION FOR JURY.

    In an action by an employé against a packing company to recover damages for personal injury which it was alleged was caused to plaintiff by an infectious disease which he contracted in handling the diseased carcass of an animal which he was negligently required to dress by defendant, the evidence *held* sufficient to entitle plaintiff to a submission of the case to the jury.

    Pardee, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Southern District of Texas.

James B. Stubbs (Charles J. Stubbs, on the brief), for plaintiff in error.

Thomas F. West, H. M. Chapman, and Ballinger Mills (Terry, Cavin & Mills, of counsel), for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

SHELBY, Circuit Judge. This action was brought in a Texas state court, and was removed to the Circuit Court. The plaintiff, John T. O'Connor, claimed $20,000 damages for injuries received by him while in the service of the defendant, the Armour Packing Company. Among other averments, it was alleged in the petition that defendant is engaged in the business of selling meat to the retail butchers to be retailed in the city and county of Galveston and elsewhere; that plaintiff was heretofore employed by the defendant, and in the course of such employment it was his duty to skin the cattle received in hides at defendant's warehouse, and while so engaged on or about May 27. 1905, while skinning and preparing certain meats for market, as it was his duty to do, he became infected with a disease known as "charbon," with which disease the cattle, or some of them, which he was handling, were infected, and he contracted the disease by contact with such meats while performing his duty to the defendant; that it was the duty of the defendant to use a proper and ordinary degree of care for plaintiff's safety by not requiring him to work upon diseased meats and prepare them for the retail trade, in which duty to plaintiff the defendant wholly failed; that the defendant, by the use of a proper and ordinary degree of care, knew or should have known that the cattle plaintiff was directed to prepare for market were diseased, and that infection would result from the handling of them; that previous to his infection and injury through defendant's negligence, as herein alleged, he was a healthy, able-bodied man, but since his injury he has been unable to work or earn a livelihood, and for a time has been and will be totally disabled from working and earning the wages that he

would have been able to earn if he had not been injured through defendant's negligence, as alleged, and his disability will continue for a long time to come; that, as a result of the infection of plaintiff from the diseased meat, his right arm became swollen and painful, and a malignant pustule broke out on his arm, requiring two severe operations to be performed upon him, and two pieces to be cut from his arm, and he was confined to his bed and room for several weeks, during which time he suffered great physical and mental pain and anguish, and was unable to earn a livelihood for himself and family, and is still unable to work and earn wages.

The defendant's answer contained a general denial of the petition.

On the trial it was proved, without material conflict, that the relation of employer and employé existed between the plaintiff and the defendant; that the latter was engaged in the business of slaughtering cattle and selling meat; that plaintiff was in the service of the defendant at Galveston, Tex.; that he became, while so engaged, afflicted with a disease of some kind which caused him to consult a physician; that he was treated for such disease and was subjected to two painful surgical operations; and that the affliction caused him expense and damage. There was evidence on the part of plaintiff that he sustained a scratch or injury while skinning a calf in defendant's plant on May 27, 1905, and that shortly thereafter the disease appeared at the place of such injury or scratch. There was evidence on the part of the defense that any injury he received was in handling a quarter of beef in defendant's plant.

The evidence relating to the three propositions or questions of fact discussed later will be stated as each question is considered.

After all the evidence was presented, the trial judge instructed the jury to return a verdict for the defendant. The plaintiff excepted, and the only question necessary to be decided is whether or not the case should have been submitted to the jury.

A case should be taken from the jury if the evidence is so distinctly all one way that a verdict to the contrary would shock the judicial mind, and, would be set aside as having no evidence to sustain it; but, on the contrary, when the evidence is such that reasonable men may fairly differ as to what is proved, or as to the inferences to be drawn, the determination of the matter should be left to the jury. The question of negligence is generally for the jury. It is only where the evidence is without material conflict, and is such that all reasonable men must draw the same conclusion from it, that the question of negligence is for the court. Where the trial judge is in doubt as to whether or not he should direct a verdict, the better course is to submit the case to the jury. While the rule on this subject is found in varying phrases in hundreds of reported cases and is familiar to bench and bar, it is recognized that its proper application to different cases as they arise requires careful and discriminating judgment. The trial judge is required to apply the rule during the progress of the trial and without opportunity to closely examine the evidence offered. Even when the evidence is all in print and carefully scanned, we find experienced judges differing on the question of its sufficiency to carry the case to the jury. Each case must, of course, be decided on its own facts.

This case should have been submitted to the jury, if, in addition to the proof we have mentioned, there was evidence tending to prove three propositions:

First. That the disease with which the plaintiff was afflicted was anthrax.

Second. That he became infected by handling a calf or beef infected with that disease.

Third. That the defendant was guilty of negligence in causing the plaintiff to handle the infected calf or beef.

The evidence relating to each proposition must be examined separately; but it may be found that the evidence bearing on one proposition tends to prove another.

First. The evidence tending to show that the plaintiff's disease was anthrax or charbon may be briefly stated. Dr. Lawrence, the physician who attended the plaintiff, testified that the plaintiff came to him for treatment about the 28th or 29th of May, 1905; that he had a small sore on his right arm about the size of a dime; that there was a depressed grayish circular lesion with slightly elevated hardening edge, and in the edge two or three small blisters; and that the plaintiff had fever. The doctor learned from his patient that three days previous he had received a slight injury to his skin while dressing a calf. The witness described the plaintiff's symptoms with more particularity than it is necessary to repeat here. In answer to a question as to his diagnosis, he said:

"I diagnosed it at that time as a case of charbon or anthrax, and that this was the point of infection and the seat or starting of the disease, and that the germs had gained access through the skin through this lesion."

The physician proceeded to treat him for anthrax, using a local anesthetic and cutting out the affected parts. He had to perform a second and more serious operation; this time administering chloroform. The progress of the disease and its disappearance under treatment confirmed the witness in his diagnosis. He was "perfectly satisfied" that it was charbon or anthrax. Dr. Lawrence sent part of the flesh or tissue taken from the plaintiff's arm to a pathologist, Dr. James J. Terrill, who examined it and made a report that it contained anthrax bacilli. He also submitted to Dr. Terrill "smears" on glass of the flesh or tissue taken from the plaintiff's arm, and received a report that those "smears" also contained anthrax bacilli. Dr. Lawrence testified that the result of the examinations made by Dr. Terrill confirmed his diagnosis. Dr. Terrill was examined as a witness, and explained the process by which he discovered and proved the anthrax bacilli to be in both the tissue and smears. He was cross-examined to show that by other and additional experiments he could have added to the reliability of the diagnosis; but he adhered to the opinion that the processes resorted to by him were sufficient, and that the flesh and smears contained the anthrax bacilli. We think it cannot be denied that this evidence was sufficient to entitle the plaintiff to go to the jury on the first proposition. In fact, this conclusion is not controverted by the learned attorneys for the defendant in error; for, in their able and instructive printed argument, they say:

"There was some testimony to the effect that the plaintiff had anthrax or charbon, and, so far as this one issue was concerned, it might have been proper for the court, had there been any testimony tending to establish the other two requisite facts, to have submitted this issue to the jury."

Second. The plaintiff himself testified to facts bearing on the second proposition. On the 27th of May, 1905, he helped to skin three calves. While skinning the second calf, his hand slipped, and he was cut by the bone underneath the calf's neck. The wound became inflamed. He suffered from it on Sunday, and on Monday he went to Dr. Lawrence. We have already quoted Dr. Lawrence as to the treatment and diagnosis. The calf, the witness said, "looked mighty rough." It had "dark brown reddish spots on the inside and outside where the hide was, and the spots would not come off." The spots were on the outside where the hide came off—under the hide. There were spots also "about the skirt lining." Following instructions, he washed the calf off with a preparation of soda and water. Woodliff, who was present when the plaintiff received the injury, describes the calf as being in a "very bad condition, so that it had to take a wash to clean it up." The witness said "it was slimy" on the inside and outside, too. It had "a kind of dark slimish color to it." Dr. W. A. Knight, a witness for the defendant, was asked on cross-examination:

"An animal that has anthrax, and after it has been slaughtered, are there or not hemorrhagic spots?"

And he answered:

"Yes, sir; there would be hemorrhagic spots. There would be contusions. It would be very plain to see in the tissues. The tissues, under the skin of the animal, have a yellow or oedemic condition."

Another witness for the defendant, Dr. A. H. Wallace, describing the disease, said:

"There may be spots."

He said, describing the last stages of the disease:

"On the inside of the carcass—that is, on the membrane lining of the abdomen and the lining of the chest walls—will find irregular spots on the inside of the carcass, of a reddish color. In the last stages you will find an infiltration of the serum, a gelatine or waterish substance in the muscles, and in some cases portions of the skin you might find spots."

There is no conflict among the experts examined that anthrax is an infectious disease, and that it may be transmitted by contact with the diseased carcass, especially by contact that reaches the blood circulation. The evidence bearing on the first proposition aids the plaintiff in proving the second, because, if the jury should conclude that the plaintiff was afflicted with anthrax, there is evidence from which they might conclude that he was infected by coming in contact with the carcass of the calf. Considering such evidence in connection with the description of the calf given by O'Connor and Woodliff, and the description of the effects or marks of the disease by Knight and Wallace, we cannot say that there was no evidence tending to show that the plaintiff became infected as alleged in his petition.

Third. The proposition as to the sufficiency of the evidence to carry the case to the jury on the question of the defendant company's neg-

ligence requires some comment of a general nature, and involves an inquiry as to the duty of the master to the servant, and the further question as to whether the facts, without dispute or contradiction, show the performance of that duty by the master.

1. It was a part of the common law that our ancestors brought with them to this country that an action for damages would lie "for the entry of diseased cattle into the plaintiff's close by which the plaintiff's cattle were infected." Anderson v. Buckton, 1 Strange, 192. In Cesar v. Karuts, 60 N. Y. 229, 19 Am. Rep. 164, it was held that a landlord who lets premises knowing they are infected by a contagious disease, without notifying the tenant, is liable to the latter for the damages sustained in case the disease is communicated. In Gilbert v. Hoffman, 66 Iowa, 205, 23 N. W. 632, 55 Am. Rep. 263, it was held that an innkeeper who kept his inn open for business, knowing that it was infected with smallpox, was liable for damages to a guest who contracted the disease while there. In Eaton v. Winnie, 20 Mich. 156, 4 Am. Rep. 377, Cooley, J., speaking for the court, held:

"That a party who being allowed to remain on land, under a mere license, so uses it as to make it the means of communicating an infectious disease, will be held liable in damages for all the injury thus occasioned to the property of the owner or licensor of the premises; such owner being ignorant of the danger to which his property was exposed."

In Grayson v. Lynch, 163 U. S. 468, 16 Sup. Ct. 1064, 41 L. Ed. 230, the Supreme Court sustained a judgment for damages suffered by reason of disease being communicated to herds of plaintiff's cattle through the negligence of the defendant. These cases all recognize the fact that there is danger in contagious or infectious diseases, and that defendants may be held liable to plaintiffs who are injured by the negligence of defendants in reference to such ailments. In Kliegel v. Aitkin, 94 Wis. 432, 69 N. W. 67, 35 L. R. A. 249, 59 Am. St. Rep. 901, the principle was applied in a suit by a servant against the master. It was there held that a master is liable for exposing to a contagious or infectious disease a servant who is ignorant of the danger and unable to know of it by the exercise of ordinary care, and who thereby contracts the disease, if the master knew, or in the exercise of ordinary care ought to have known, of the danger, and did not warn the servant.

2. It may be stated as a general rule that a master is bound to take ordinary and reasonable care not to subject his servant to unreasonable or extraordinary dangers by putting him to work in dangerous buildings, on dangerous premises, or with dangerous tools, machinery, or appliances. If the master fails in his duty in this respect, and the servant in consequence of such failure is injured, without fault on his part, and without having assumed the risk of the master's negligence, he may recover damages of the master. 4 Thompson on Negligence, §§ 3759, 3986. The same principle is applicable where the servant is put to work on material that is dangerous to his health or life. The duty of the master in this respect is primary and unassignable; that is he becomes responsible for the negligence or inexperience of anyone to whom

he delegates the performance of it. 4 Thompson on Negligence, § 3988. Thompson says that:

"No general definition of negligence can be of much value in the practical administration of justice."

The same observation is true as to the definition or statement of the degree of care required of an employer in protecting his employés from injury. It may be stated generally, however, that he is required to adopt all reasonable means and precautions to provide for the safety of his servants while in the performance of their work; and that he is required to exercise such care as an ordinarily prudent man would exercise under the circumstances. He is not an insurer of the safety of his servant, but is required to exercise ordinary and reasonable care for his safety. 1 Labatt on Master and Servant, § 14, and notes.

3. The defense relied on by the defendant is that he did exercise reasonable and ordinary care, and that, if it be true that the plaintiff became infected as alleged, it was not by reason of negligence on the part of the defendant. There was no inspector of cattle or meats at the defendant's plant in Galveston. The evidence tends to show that the calf which the plaintiff claims was infected was slaughtered at the defendant's plant in Ft. Worth, and shipped to Galveston to be skinned, sold to butchers, and by them sold by retail to consumers. The defendant contends that it exercised ordinary and reasonable care, in that all cattle slaughtered in May, 1905, at its Ft. Worth plant was inspected by men employed by them to purchase cattle, and especially that the United States government inspectors inspected all cattle purchased and slaughtered at its plant in Ft. Worth. The contention is that this evidence of inspection is such that it shows without conflict the exercise of reasonable and ordinary care, and therefore the absence of negligence. The evidence of inspection on the part of the defendant's agents is not urged as being in itself sufficient. J. E. McCarthy testified that he had been defendant's cattle buyer at Ft. Worth for four years. "They are examined carefully. * * * We aim to buy something that will make good veal or beef, and, if it looks at all doubtful, we buy subject to government inspection. If the animal seems to have anything at all the matter with it, we buy it separate, and it is held separate and the government man takes it, etc. If it is all right, it is passed, and, if not, it is tanked. When it is tanked, it is boiled up and goes into grease for fertilizing." His plan was not to reject cattle, although it might seem to be diseased, but he would let it take its chance to pass the government inspectors. Wm. Cargill, the defendant's manager at the Ft. Worth plant, referring to cattle purchased at Ft. Worth, said:

"The government inspectors have rejected many. * * * There are some rejected daily."

Both of these witnesses corroborated Dr. A. H. Wallace as to the general system of government inspection in force at the Ft. Worth plant.

The defendant company relied mainly on the evidence of Dr. Wallace to show that a proper inspection was made of cattle slaughtered at Ft. Worth. He is a veterinary surgeon in the service of the department of agriculture at Ft. Worth. He described the system of ante mortem and post mortem inspection in force by the United States government inspectors in May, 1905. Such inspection, he said, was made of all animals slaughtered. Those condemned were tagged, tanked, and destroyed. All that were not condemned were marked with gelatine labels, showing inspection. When a calf was slaughtered and dressed, but not skinned, "the label is placed on the side of the carcass on the inside of the flank." He had under him "23 or 24" men. "Two were assigned to cattle inspection, post mortem work. * * * These men, of course, are required to be present at all times when slaughtering is going on, and are required to examine every animal slaughtered." It was the witness' duty to "go around at different times" and to see that the men are attending to their duties.

No one of the 23 or 24 men in service under Wallace was examined as a witness. Wallace began this supervision at the Armour plant "not later than May 13, 1905." The alleged infection of the plaintiff occurred May 27, 1905. The evidence leaves it in doubt as to how long the calf alleged to be infected remained in the Galveston plant before it was skinned. If it was inspected at the Ft. Worth plant, it does not seem to be certainly proved that such inspection occurred after May 13th, when Dr. Wallace took charge.

Dr. Wallace testifies that the veterinary who looked after the post mortem inspection of calves was Dr. Peck, who, when the witness last heard of him, was practicing at Independence, Mo. He was not examined as a witness, nor was his deposition taken.

The statute and rules for inspection by government officials is only applicable to cattle slaughtered for interstate shipment, and the calf in question was slaughtered in Texas and not shipped out of the state, but the evidence tended to show that all cattle slaughtered were, in fact, subjected to the same inspection.

The inspection made by Dr. Wallace and other government officials was made under the provisions of Act March 3, 1891, c. 555, 26 Stat. 1089, as amended by Act March 2, 1895, c. 169, 28 Stat. 732 [3 U. S. Comp. St. 1901, p. 3190].

As we have already stated, the master is in duty bound to exercise reasonable and ordinary care not to subject his servant to extraordinary danger by putting him to work in a dangerous place, with dangerous machinery or appliances, or on material dangerous to his health or life. From this duty there has arisen the rule that it is incumbent on the master to inspect or have inspected the place where the servant works, and the tools, appliances, and material with which he is required to work. The contention of the plaintiff is that the defendant has negligently failed to perform this duty, and the contention of the defendant is that the inspection by the government was all that could be required, and that, under the circumstances, the master was not chargeable with the duty of making any inspection. It was not denied that the doctrine requiring inspection was applicable to the case, but the

contention is that the inspection provided was sufficient, as matter of law, to relieve the defendant of the charge of negligence.

The object of the federal statutes requiring inspection was to provide additional safeguards against the traffic in spoiled or diseased cattle and meats. They should not be so construed or applied as to deprive any one injured or damaged by the negligence or wrongdoing of a dealer in or a vendor of cattle or meats any remedy which he had under laws existing when the statutes were enacted. We are not of opinion that the inspection by government officials of a place, machinery, instrumentality, or material necessarily and as matter of law releases the master from his duty to make such examinations and inspections as are required of him by the rule which demands that he exercise ordinary and reasonable care for the safety of his servant. This duty of the master is absolute and inalienable. He cannot transfer it to another so as to avoid responsibility. 4 Thompson on Negligence, § 3791. It would seem to follow that the court, in the absence of a statute requiring that course, cannot permit another to assume the responsibility for him. In McGregor v. Reid, 178 Ill. 464, 53 N. E. 323, 69 Am. St. Rep. 332, it was held that inspection of freight elevators by city officers and indemnity companies did not as matter of law relieve the owner of the elevators from liability for their defective condition. Commenting on the effect of the inspection of others than the proprietor himself, Labatt says:

"It is difficult to admit that the fact of an appliance having been pronounced sound by an official inspector should be deemed to preclude the jury from considering whether his inspection was really an adequate one. Such an inference seems to be unwarrantable without assuming the possession by such inspectors of a much larger measure of skill and diligence than can be fairly credited to any class of employés."

And the learned author adds:

"Another objection to holding the master not liable as matter of law is that the doctrine of nondelegable duties is virtually ignored." 1 Labatt on Master and Servant, § 165.

See, also, 3 Thompson on Negligence, § 3700.

Granting the contention of the defendant that, to show the exercise of reasonable and ordinary care, it may avail itself of the inspection proved to have been made under the supervision of the government, it must of necessity follow that the defendant is burdened with the deficiencies, if any are shown, of such inspection. The defendant cannot ask more than that the case should be examined as if the government inspectors were its own inspectors. It is clear that the master's entire duty is not performed when he employs competent and skillful inspectors. That is only the first step necessary to secure the reasonable safety of his servant. There must be a reasonably careful and skillful inspection. Although the master may have engaged competent and skillful inspectors, if a servant is injured in consequence of a defect which would have been discovered by a reasonably careful and skillful inspection, but was not discovered, the master will be liable. 4 Thompson on Negligence, § 3793; 1 Labatt on Master and Servant, § 157; C., C., C. & St. L. Ry. v. Ward, 147 Ind. 256, 45 N.

E. 325, 46 N. E. 462. Was there evidence in the case from which the jury might have concluded that no inspection of the calf in question was made; or, if made, that it was made unskillfully and negligently? Dr. W. A. Knight, a witness called for the defendant, testified that anthrax would not necessarily be discovered by an inspection of the animal on foot. It might escape detection if it had not "broken out," but that after the animal is slaughtered, and a post mortem examination is made, "the entire relations would be 'such that it could not possibly slip an inspector." The witness gives a full description of the effects of the disease in enlarging the organs of the animal and in causing "hemorrhagic spots." No one can read the description and fail to see that a reasonably careful inspection by a reasonably skillful inspector would easily discover the existence of disease. There is much other evidence, which it is unnecessary to quote, which is confirmatory of this view.

Considering all the evidence in the record, we think it was at least sufficient to carry the case to the jury.

The judgment of the Circuit Court is reversed, and the cause remanded for a new trial.

PARDEE, Circuit Judge, dissents.