## SABINE TOWING CO., Inc., v. BRENNAN et al.*
### No. 7267.

Circuit Court of Appeals, Fifth Circuit.
July 17, 1934.

Rehearing Denied Aug. 27, 1934.

FOSTER, Circuit Judge, dissenting.

John D. Grace, M. A. Grace, and Edwin H. Grace, all of New Orleans, La., for appellant.

H. C. Hughes, of Galveston, Tex., and M. G. Adams, of Beaumont, Tex., for appellees.

Before BRYAN, FOSTER, and HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

Appellant, petitioner in "a cause of exoneration from or limitation of liability" on account of the sinking of the tugboat Edgar F. Coney and the loss of her crew, was unsuccessful below. The District Judge found that the weather in which the Coney was operating at the time it sank was not unusual, but reasonably to be expected at that time of year. He thought petitioner had failed to carry the burden it was under to show that the tug was seaworthy and properly equipped and supplied. He found too, that the proof affirmatively established that in making the repairs on the Coney the owner had negligently made it unseaworthy as to stability and buoyancy by overweighting it. Denying the petition, he found for claimants.

*Writ of certiorari denied 55 S. Ct. 141, 79 L. Ed. —.

Appellant challenges these findings and the decree on which they rest as without support in the evidence. It argues that the storm in which the Coney sank was sufficiently severe to account for the sinking without fault. It argues too, that the showing it made regarding the outfitting and preparation of the Coney for its change of use from coastwise to ocean going, fully satisfied every requirement of due care. It argues, finally, that if there was negligence in equipping and outfitting the Coney its proof has clearly shown that this was without its knowledge or privity. Claimants reply, not so. Vigorously defending the findings, they argue that they are in accord with the great preponderance of the evidence; indeed, that no other view would be reasonable. Appellant and appellees are in substantial agreement as to the controlling principles of law. Their differences, except in one particular, arise out of their conflicting views of what the evidence established. The point of law on which they differ is whether, to avail of limitation, the barge should not also have been surrendered. The District Judge decided this issue in favor of appellant. Claimants argue here with conviction that this was error. They insist that the barge must be surrendered along with the tug as a condition to limitation—citing Sacramento Nav. Co. v. Saltz, 273 U. S. 326, 47 S. Ct. 368, 71 L. Ed. 663; Standard Dredging Co. v. Kristiansen (C. C. A.) 67 F.(2d) 548; In re W. E. Hedger (C. C. A.) 59 F. (2d) 982; Alvah H. Boushell (C. C. A.) 38 F.(2d) 980; The El Sol (D. C.) 45 F.(2d) 852.

While we think claimants are right that the barge should also have been surrendered, we do not find it necessary to determine the effect of the failure to surrender it, nor whether it may still be surrendered, because of our view that on the merits the decree for claimants was right. We address ourselves to those. The facts may be quite briefly stated, for though considerable testimony was taken, the issues are few and narrow, and the case made was in small compass.

On January 28, 1930, the Edgar F. Coney left Sabine Bar with the barge "Pure Detenox" in tow, bound for Pensacola, Fla. At this time the weather conditions were moderate. During the afternoon and night they grew worse, with heavy rain squalls and shifting winds. The barge, however, steered all right following in the wake of the tug, and no signals were exchanged indicating danger or trouble. The weather, while severe, was not unusual for that time of the year. As the captain of the barge and some of the crew

put it, "We have been in that kind of weather many times" and they were not expecting or looking for any trouble. The night was very dark, but there were flashes of lightning which enabled them to see the tug from time to time. About 10 p. m. the crew on the barge noticed the lights on the tug, which had been appearing and disappearing at intervals, finally disappear altogether. Shortly after this cries for help were heard from men in the water near by. Due to the condition of the weather, the barge being deeply loaded, and seas breaking over her decks, with a stiff wind and heavy rain at the time, they were unable to launch the life boats and could only throw life buoys and life belts and other available gear to the men in the water. Shortly afterwards, discovering that the barge was not being towed, they succeeded, though with difficulty, in letting the anchor go and anchoring for the night. On the morning of January 29, the towing hawser was hauled onto the barge with towing hooks on end intact. The chain had parted from around the bitts on the tug. The barge crew then discovered the topmast of the tug sticking out of the water about 4 feet, indicating that the tug was resting on the bottom in about 42 feet of water. All on the tug were lost, and what actually caused it to sink can be determined only circumstantially. For many years the Coney, a Tampa tug, had been engaged in towing coastwise. Appellant in the latter part of 1929 bought it for $30,-000, and after spending $20,000 on it in repairing and reconditioning it, obtained a certificate of inspection from the United States local inspector in which the license was enlarged from coastwise to ocean going. It is not claimed that any of these repairs were badly made, or that any bad material was put into them. The claim is that the Coney was cranky, and unstable, and that only by precisely keeping it within the load and draft limits prescribed for it in an inclining test, which it had been subjected to many years before at Tampa, could it be safely operated even coastwise. Specifically it was proven that a Dialogue boat, well and safely built, it had from time to time undergone changes in construction and in use from coastwise to ocean going which had made it so unstable as to require an inclining test, that as the result of this test permanent orders had been issued limiting its draft to 10 feet 5 inches under fixed weight conditions, and that while these weight conditions and this draft were observed, it had been safely operated. It was claimed that appellant, the new owner of the tug, in disregard of these restric-

tions, added weight to it which put it down in the water below the draft fixed and so reduced its freeboard as that when subjected to the action of heavy seas rolling over it, it was made unable to come easily up, and put in great danger of sinking. It was around this point, as to the correctness of the test made by Captain Noel, and as to what was actually done to conform to it, that the great contention raged. Captain Noel testified for claimants in support of his test, while for the petitioner a Mr. Slade very vigorously disputed Noel's measurements and conclusions, and insisted that the Coney had a much greater depth of hull than Noel allowed it, and that by correct measurements it could have been loaded to 11 feet 10 inches, still leaving 1 foot 1 inch for freeboard. Noel testified by deposition; Slade in person.

Another matter of dispute and contention was whether the Coney's fuel tanks were cut down 24 inches as required by the order, or only 12 inches as desired by her then owner. A great deal of testimony bearing circumstantially on this point, but not directly establishing it, was taken. That the boat had been thought cranky and unstable, and that the inclining test was deemed necessary and was made, was not disputed. The dispute was over whether the test had been properly made, whether the requirements had not been more rigorous than necessary, whether those made were met, and whether the additional weight the new owners added could have made it unstable. The petitioner was in the embarrassing position of having, after the loss, to minimize the importance of, and to explain away as far as possible, the stability test and the conditions imposed as the result of it, because in purchasing the vessel and reconditioning it for ocean going, and especially in adding the weight which was added, it had acted in complete ignorance of the fact that the test had been made, and in reliance entirely on the certificates of inspection and the oral reports it got without resorting to the information about the boat which was in writing, and easily and readily available. In addition, therefore, to vigorously claiming the protection of and the right to rely on the certificates of inspection the boat had, the petitioner struggled hard to show that the crankiness and instability the boat had evidenced before the inclining test was ordered was the result of improper handling, and, if not, that Noel had greatly magnified its gravity in his inclining test, and had imposed unreasonable conditions through wrong measurements and a misunderstanding of the na-

ture, character, and service of the boat. Claimants, in support of their position that the inclining test was accurately made, and the conditions imposed were wisely fixed, proved by Wiebe, for many years its master, that after the test the boat was run for years with the loaded draft kept down to the 10 feet 5 inches recommended, and that during that time it had had no trouble, and they proved also that the addition of 6 tons to its weight would reduce the freeboard. As to just how low the tug sat in the water, what its draft was, and what freeboard it had when, fully loaded, it set out on its voyage, there was no direct testimony. Appellant offered the testimony of its officers and employees and also of the government inspectors that, while they made no tests for stability, the boat looked to be and they thought it was entirely seaworthy and in good shape, and that they did not notice any substantial difference in its freeboard before and after the additional weight had been put on. The only witnesses purporting to state how low it was in the water after its fuel tanks were filled and it was ready for the trip were the master of the barge and some of the employees, but none of these undertook to state the loaded draft or the freeboard of the tug, except that Barrios, the barge master, testified in answer to the question, "How much freeboard had she," "The top rail was on top of the water about half a foot." Some of the men testified in a general way that the tug sat "no deeper in the water than the rest of them are when they get oil." Barrios' testimony that the top guard was 6 inches above the water was neither denied nor explained. Claimants rely upon the testimony regarding the necessity for, and the making and result of, the inclining test, and the conditions imposed afterwards, upon Noel's testimony that, fully loaded, the tug had a draft of 10 feet 11¹³⁄₁₆ inches, with a total depth of hull of 11 feet 6 inches, and a freeboard of only 6³⁄₁₆ inches, and the proof that it sunk in weather usual and to be expected at that time of the year. They argue that here is the complete and perfect explanation of the sinking, an overloaded tug without sufficient buoyancy, subjected to the beat and wash of heavy seas. They rely too, upon it that the instability of the vessel and that it had been subjected to an inclining test, and the orders governing and controlling the weight and load limit thereafter were all matters of record and in printed form available to the purchaser. They argue that it was negligence on appellant's part to buy an old tug which had undergone as many changes and uses as the

Coney had, and, in order to convert it from coastwise to ocean going, put additional weight on it without first obtaining a thorough acquaintance with the history of the boat, and without taking the precautions against making it unstable which that history required. The Vestris (D. C.) 60 F.(2d) 273; The Miami (D. C.) 43 F.(2d) 562; Union Pac. Ry. v. James (C. C. A.) 56 F. 1001. They argue that this was negligence, negligence in its very nature that of the petitioner, not only because this was a matter which could not have been delegated, but because it was not in fact delegated to any person. They point to the undisputed evidence that the officers of appellant themselves conducted the purchase and made all the inquiries, and that though the general supervision of conditions and repairs was under the charge of Guy, the port engineer, none of them were adopted or installed without consultation with the officers and approval by them.

Appellant insists that all of the deductions appellees make are based on the false premises of Noel's measurements and views, and appellant's claim, contrary to the evidence, that the fuel tanks were not cut down 24 inches as required. Pointing to Slade's testimony, that the depth of the hull was at least a foot more than Noel gave it, it urges that the tug must have had a freeboard of at least 2 feet, before the additional weight was put on it, and that that could not have lowered it more in the water than 2 to 3 inches, a negligible thing with that freeboard. Replying to appellees' urging that the circumstances show clearly that the vessel was unseaworthy, it argues that this is not sufficient; it must be shown that if unseaworthy, it was so because of appellant's negligence. It points to the certificates of inspection obtained year after year and just before this voyage was begun, to the testimony of the owner's officers and of the inspectors that everything was done which in their opinion ought to have been done to make the vessel seaworthy, as proof that no negligence appears.

We think it plain, in fact, the record leaves no room for question, that whatever may be said in favor of exoneration altogether, because of failure to prove negligence, this is not a case for limitation of liability. Whatever was done with the tug or about it was the act of the owner through its managing officers, and, if there was negligence, the owner was privy to it. All of those who testified for appellant make this clear. While they testified positively that Guy was the port engineer and in charge of repairs, they testified too that he made no serious repairs without consulting the officers, and that everything that was done by him in actually equipping this vessel was done under their supervision, and with their approval. Under these circumstances, if there was negligence, the officers were privy to it, and appellant, present in the presence of its managing officers, was privy to it too. Ft. Worth Elevators Co. v. Russell (Tex. Sup.) 70 S. W. (2d) 397; In re N. Y. Dock Co. (C. C. A.) 61 F.(2d) 777; Henson v. F. & C. Trust Co. (C. C. A.) 68 F.(2d) 144; The Malcolm Baxter, Jr., 277 U. S. 323, 48 S. Ct. 516, 72 L. Ed. 901; The Miami (D. C.) 43 F.(2d) 562; The Vestris (D. C.) 60 F.(2d) 273; Kellogg & Sons v. Hicks, 285 U. S. 511, 52 S. Ct. 450, 76 L. Ed. 903. Such difficulty as there is in the case we think arises out of the question whether petitioner is entitled to exoneration altogether, because, as appellant claims, no negligence has been shown.

Claimants' suits for death damage sound in negligence, and all questions of burden of proof aside, now that the case is fully in, if no negligence appears they may not recover. Appellant argues that its proof of weather conditions completely explains the tug's sinking, and rebuts the presumption of unseaworthiness which, but for this explanation, the sinking would raise. Martin v. The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65; Benner Line v. Pendleton (C. C. A.) 217 F. 497; The Calvert (C. C. A.) 51 F.(2d) 494. It argues further, that if it is mistaken in this, claimants still fail because they have failed to show negligence. We do not think so. Proof that the tug was lost in the dirty weather prevailing that night might, if it stood alone, be a sufficient showing to rebut the presumption of unseaworthiness arising from the mere fact of the sinking, though the storm was not an unusual one, and it is the generally accepted rule that a storm relied upon to explain the loss of a boat in rebuttal of the claim of unseaworthiness must be shown to have been of extraordinary intensity. The Rosalia (C. C. A.) 264 F. 285; The Anna C. Minch (C. C. A.) 271 F. 192, 195; American Agricultural Chem. Co. v. Brooklyn & B. Nav. Co. (D. C.) 56 F.(2d) 271; The Charlton Hall (D. C.) 285 F. 640; The Edith (C. C. A.) 10 F.(2d) 684; Atlantic Transport Co. v. Rosenberg Bros. & Co. (The Manchuria), 34 F.(2d) 843 (C. C. A.). When, however, the evidence of weather conditions is considered in the light of the whole history of the tug, and of what was done to it by adding weight, and especially when it is considered that no inclining nor stability test

was made on it, and the repairs and reconditioning were made without knowledge of or regard to its history of tenderness and crankiness, this weather evidence ceases to be explanatory of the loss as its cause. It becomes merely a condition of it. It serves but as a test of the equipment and preparation of the tug for the duties it must perform, and as proof that its condition as to seaworthiness was not what it ought to have been.

"The duty of ship owners to their seamen to see that their ship is seaworthy and her equipment in safe condition for use when she starts on a voyage is a personal one, responsibility for which they cannot escape by delegating its performance to another. In this respect it is like the common-law duty of a master to provide his servant a suitable place in which to work. And a seaman injured through failure to perform this duty is entitled to compensation." Christopher v. Grueby (C. C. A.) 40 F.(2d) 8, 12.

This duty, as to injuries, for which the general maritime law provides recovery, is absolute. Its breach without regard to negligence makes the owner liable for such losses. Carlisle Pkg. Co. v. Sandanger, 259 U. S. 255, 42 S. Ct. 475, 66 L. Ed. 927; The Silvia, 171 U. S. 462, 19 S. Ct. 7, 43 L. Ed. 241; Martin v. The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65. Too, failure to make a ship seaworthy in respect of a matter as important to the lives of the crew as its stability, is prima facie evidence of negligence. The Malcolm Baxter, Jr., 277 U. S. 323, 48 S. Ct. 516, 72 L. Ed. 901; California & Hawaiian Sugar Corp. v. Rideout (C. C. A.) 53 F.(2d) 322; Henson v. F. & C. Trust Co., supra.

The inspection certificates on which appellant relies so strongly are of course evidence bearing on the question of due care, but they are not more, The R. P. Fitzgerald (C. C. A.) 212 F. 678; The Vestris, supra; The Viking (C. C. A.) 271 F. 801, 804; In re Reichert Towing Line (C. C. A.) 251 F. 214; O'Connor v. Armour Packing Co. (C. C. A.) 158 F. 241, 249, 15 L. R. A. (N. S.) 812, 14 Ann. Cas. 66. They certainly are not evidence of the tug's stability when no tests of it were made. We think it quite clear that when an owner buys an old tug, licensed coastwise, and equips it for ocean going, it is negligence to send it out without knowing something of its stability, and especially to send it out without such tests, when as in this case its history and performance in regard to crankiness and tenderness is a matter of official record. We think the case may be summed up in the statement that, after all

evidence is in, there stands out as a complete and sufficient explanation of the sinking, in weather serious indeed, but the kind it was expected, and should have been fitted to meet, the fact that a cranky tug, which because it was unstable and lacking in buoyancy had been theretofore subjected to an inclining test, and operated coastwise under rigid requirements for safety, was prepared, equipped, loaded, and sent out as an ocean-going tug without the owner's taking notice of this prior test, and in direct violation of the limitations they fixed. We cannot find that the court erred in the conclusions he drew that there was actionable fault. The decree is affirmed.

FOSTER, Circuit Judge (dissenting).

The most important question presented for decision in this case is whether a shipowner acting in good faith is entitled to rely upon a certificate of inspection issued under authority of the United States as showing prima facie that his vessel is seaworthy. The majority opinion apparently is based upon the theory that an official inspection certificate is entitled to no weight at all.

The navigation laws of the United States (46 USCA § 361 et seq.) require every steam vessel to be inspected once a year by local inspectors, who shall satisfy themselves that she is of a structure suitable to the service for which she is employed and may be navigated with safety to life. Section 391. If so satisfied, they issue a certificate under oath which must be posted in a conspicuous place on the vessel for the information of passengers and crew. Section 400. If an inspector willfully certifies falsely, he is subject to fine and imprisonment. Section 403. Local inspectors are appointed by the Secretary of Commerce. They are required by law to be persons of good character and qualified to perform their duties from their practical knowledge of shipbuilding and navigation. Section 384. There is no provision of law requiring local inspectors to be naval architects or of any other class of experts. If Congress had deemed that essential to safety of navigation, no doubt the law would have so required.

As the majority opinion does not review all the facts I consider pertinent I will briefly restate them.

The Coney was a tug of typical model of 153 gross tons, registered tonnage. According to Noel, the expert who supervised her inclining test, she was of 325 tons displacement, could be safely loaded to a mean depth of 10 feet 5 inches, and would then have 13

inches freeboard. Other evidence in the record fixes a safe freeboard at about 11 inches. Freeboard is the distance from the water to the nearest point of the top of the weather deck, about amidships.

Petitioner, the Sabine Towing Company, is engaged in the business of towage at Port Arthur, Tex. It owns a fleet of seven ocean and five harbor tugs, nine ocean barges, fourteen harbor barges, and one or two steamships. The Coney was purchased at Tampa, Fla., in 1929, for $30,000. Before purchasing her the managing officers of petitioner consulted Eads' Marine Journal, a standard maritime publication, as to her history. She was hauled out and thoroughly inspected before her purchase, and after that was navigated by a crew under her own power from Tampa to Port Arthur. At the time of her purchase she had on board an inspection certificate issued by the local inspectors at Tampa expiring June 26, 1930, which permitted her to navigate the waters of the Atlantic Coast, Gulf of Mexico, Caribbean Sea and connecting waters. This certificate is in the record and is erroneously interpreted in the majority opinion to be merely permission to navigate coastwise waters, perhaps because she was authorized to navigate inland waters with a single crew, not to be on duty more than 13 hours in any 24 hours. With a full crew she was authorized to navigate anywhere in the waters named, say as far as the Panama Canal. No exceptions were noted on the certificate, and it contained no memoranda to indicate that she had ever been submitted to an inclining test. The managing officers of petitioner did not know she had ever been submitted to an inclining test and made no inquiry along those lines. She had on board a government publication which contained a list of ships that had been subjected to an inclining test but which gave no information regarding the result of the tests. Conceding that petitioner was charged with knowledge that the Coney had been subjected to an inclining test, I consider that nevertheless petitioner was entitled to rely upon the certificate of inspection on board as showing prima facie that the tug was seaworthy when it was issued. Had petitioner's officers examined the records of the United States Inspection Service at Tampa and in Washington, D. C., they would have discovered that she was given the inclining test in 1920, had passed it successfully as to stability but was found to be deficient in reserve buoyancy. Her after fuel tank was ordered to be cut down 24 inches. There is a conflict of testimony as to whether the tank was in fact cut

down 24 inches as ordered or only 12 inches, but it is certain the order was complied with to the satisfaction of the local inspectors and she was thereafter passed for ocean navigation. There was nothing in the government records to impeach the inspection certificate.

After her purchase by petitioner the Coney was overhauled and extensively repaired under the direct supervision of Guy, petitioner's port engineer. Guy knew nothing about an inclining test, but he had been in charge of repairs to petitioner's entire fleet for 7 years and it had not lost a vessel before the Coney. Guy was licensed as chief engineer of ocean going vessels, had many years practical experience at sea and as an engineer, and had at times acted as master of small boats. I consider there was no negligence in having him superintend the work.

It is not questioned that the repairs made the ship as seaworthy as possible unless her reserve buoyancy was seriously impaired by the additional weight added through the instalment of the new equipment in place of the old. This added some 13,000 pounds to the dead weight she carried. The local inspectors noticed the progress of the work from time to time until it was completed. She made a trial trip around the harbor and a certificate of inspection authorizing her to engage in ocean navigation was issued. She was also inspected by an inspector representing the underwriters and a policy in the amount of $30,000 was issued. Thereafter she made two trips through the Gulf from Port Arthur to Galveston, Tex., hauling barges loaded with oil. Guy made one of these trips as second engineer to observe how the boat performed. He was entirely satisfied. On this trip she encountered some heavy weather.

The tug left port on January 27, 1930, towing a barge loaded with gasoline, destined for Pensacola, Fla. This barge was strongly built, of the whale back type and of 3,500 tons, registered tonnage. The tug had on board the same crew that had navigated her on the two trips to Galveston. She crossed the bar at about 9:45 o'clock in the morning. The weather was somewhat foggy but the sea was calm and only a light breeze was blowing. About 2 o'clock that afternoon she encountered a strong wind in the Gulf, which steadily increased in force. About 10 o'clock that night she foundered and all hands on board were lost. After the tug foundered the barge dropped anchor and successfully rode out the storm. It is reasonably certain the tug did not capsize as divers found her resting on an even keel at the bottom in some 42

feet of water. This would indicate she was not lost because of instability.

The majority holding is that petitioner was negligent in adding the additional weight of equipment and that in consequence the tug did not have sufficient freeboard. A number of witnesses, experienced seamen, testified that the tug in the water appeared to be about the same as other tugs of the same size and character, and there is evidence that she had sufficient freeboard. The majority opinion disregards all the other testimony and is based on an excerpt from the testimony of Barrios, the captain of the barge, given before the United States Board of Inspectors investigating the disaster. Barrios testified that the tug looked to him like a good seaworthy tug and he had heard no one complaining about her condition. The following was brought out in the course of his testimony:

"Q. How much freeboard had she? A. The top guard was on top of the water.

"Q. How much? A. About one-half a foot."

I consider this testimony entirely consistent with that of the other witnesses. The guard rail on a tug is a timber bolted fore and aft to her side to serve as a fender. On a tug the size of the Coney unless it were at least 4 inches thick it would not be strong enough to be of any service. It might have been 5 or 6 inches thick. It is obvious that the top of this guard rail would not be placed above the deck of the vessel. Noel testified that on the Coney it was placed "a couple of inches below the deck." If the bottom of this guard rail were 6 inches above the water the tug had freeboard of at least 12 to 13 inches, which would be sufficient according to all the evidence in the record.

It is evident that the experienced seaman who superintended the repairs of the tug and the local inspectors regarded the addition of say 6½ tons of weight to her equipment as negligible. According to Noel's testimony, 7.34 tons added weight would put her down in the water 2 inches. On this basis her added depth was about 1¾ inches. There is no exact mathematical formula for determining the safe load line and freeboard of a vessel. Much depends upon the opinion of experienced seamen in determining these factors. See discussion by Walton in "Know Your Own Ship" p. 330 et seq. The load line of a vessel varies from time to time according to her cargo, and whether she is in fresh, brackish, or salt water. The freeboard of the Coney must have appreciably increased with the consumption of fuel over the period of 12 hours before she foundered. I am convinced that the additional weight of equipment placed upon the tug did not materially affect her reserve buoyancy.

The majority holding is that the tug was lost in weather she might have been expected to encounter. There is uncontradicted evidence in the record, from masters of vessels who were in the vicinity, that at the time the tug was lost the wind was blowing at a rate of from 60 to 65 miles an hour, with occasional gusts of greater intensity. A wind of 75 miles an hour is rated a hurricane. The puffs might have easily been of that force. Again all other testimony is disregarded by the majority, and the conclusion that the weather was such as ordinarily to be expected is based upon the testimony of Barrios, the master of the barge. Again I am forced to disagree with the conclusion of the majority from my construction of Barrios' testimony. It is apparent that Barrios was illiterate. Under careful leading on cross-examination he testified that he frequently encountered bad weather and expected to encounter it every trip. But he repeatedly stated it never broke anything on his boat, and that night it was "bad, bad weather." It is undisputed that the force of the gale broke every window in the pilot house on the barge, which was located some 15 feet above the water line. Several planks were carried away from the pilot house, and one-half of the bridge running forward from it was also carried away. The extreme severity of the weather is conclusively shown by the fact that the barge was unable to launch its lifeboat to go to the rescue of the crew of the tug. The barge was deeply loaded which made her steadier, brought her boat deck closer to the water, and made the launching of her lifeboat easier than if she were light. The fact that the barge rode out the gale at anchor is not evidence that the weather was ordinary. She was more than twenty times the size of the tug, and the very reason for anchoring a boat in a storm is because she is safer than if under way. The tug successfully weathered the storm for some eight hours. It might well have been that laboring in the storm caused her to spring a leak; or that a door in the house was carelessly opened, permitting a wave to inundate the hold; or that it was an error of navigation on the part of her master not to turn back or anchor. The bodies of the crew picked up had on life preservers, showing that the foundering was not sudden and unanticipated. The circumstances of the case in my opinion do not show that the boat was lost in ordinary weather through a defect of construction. On the contrary I am inclined to believe that the storm was severe

enough to have caused a perfectly seaworthy tug of her size to founder.

The management of ships is a matter of practical business. Vessel owners are not required to employ experts and may rely upon men of practical experience in the making of repairs and alterations. I think petitioner when purchasing the Coney was entitled to rely upon the certificate of inspection as prima facie evidence that she was then seaworthy for the purpose of ocean navigation. Petitioner was not required in the exercise of reasonable care to make inquiry beyond the certificate. Had its managing officers done so they would have found nothing in the records of the inspection service that would have affected the certificate of inspection in any way. It was not incumbent upon petitioner to require an inclining test after they had completed their repairs to the Coney. The government inspectors had authority to order it if they thought it necessary. The inspectors were charged with knowledge of all the facts relating to the boat's history. Petitioner was not guilty of concealment or fraud and acted in good faith throughout. Petitioner was also entitled to rely upon the last certificate issued to the boat unless the defect was apparent to an unskilled person. The Annie Faxon (C. C. A.) 75 F. 312. If the Coney was unseaworthy by reason of deficiency in buoyancy, that fact was not ascertainable by ordinary inspection. It was the duty of petitioner to the crew to use reasonable care to furnish a seaworthy ship, but there was no absolute warranty of seaworthiness and it was not an insurer of their lives. It is perfectly plain that every person of nautical experience, who had anything to do with the Coney after she became the property of petitioner, believed her to be seaworthy. Members of the crew who were unfortunately lost had been on her sufficiently long to become familiar with her behavior. It is unbelievable that they would have continued on her if they had had the slightest suspicion that it was dangerous to their lives to do' so.

On the whole case I am convinced that petitioner was not guilty of negligence that would bar the relief of limitation of liability. For these reasons I respectfully dissent.

On Petition for Rehearing.

PER CURIAM.

As neither of the judges who concurred in the decision of the court in the above numbered and entitled cause is of opinion that the petition for rehearing should be granted, it is ordered that the said petition be, and the same hereby is, denied.