## THE BERGENSEREN.

## KAINER et al. v. THE BERGENSEREN et al.

### (District Court, S. D. New York. November 22, 1888.)

SHIPPING—CARRIAGE OF GOODS—PERILS OF THE SEA.

Provisions stowed in a water-ballast tank were found damaged in several feet of water, which had made its way into the tank either by some improper opening of the water-pipe that led to the tank, or else through an empty rivet-hole in the bulk-head communicating with the fire-room. The passage was stormy; but, it being found that the accumulation of water in the fire-room arose mainly from the inexperience and mistake of the second engineer in charge, *held* that, even if the water in the tank came through the rivet-hole, as the defendants contended, the ship was liable, both for the latent defect of the rivet-hole, having reference to its relation to the stowage of cargo, and for the inexperience and mistake of the second engineer; neither being sea perils within the exceptions of the bill of lading.

In Admiralty.

The above libel was filed by five consignees of cargo on board the steamer Bergenseren on a voyage from New York to Port de Paix, claiming about $6,000 damages to their goods. The goods consisted of beef, pork, lard, butter, etc., known as "wet cargo," and were stowed in the water-ballast tank, a compartment nearly amid-ships, and separated from the fire-room by an iron bulk-head. The floor of the tank rested upon the ship's ribs, and was 17 inches lower than the floor of the fire-room on the opposite side of the bulk-head. The vessel left New York October 28, 1887, and arrived at Port de Paix, November 3d. She encountered, according to the log, a heavy south-west gale on October 30th, and a heavy north-east sea, causing the vessel to roll heavily. This continued during the 31st of October and 1st of November, moderating on the 2d. On discharging the cargo, about three feet of water was found in the ballast tank, and much of the cargo stowed there was damaged and broken. How the water got into the ballast tank was not ascertained there; and, upon the vessel's return to New York, there was discovered, about eight inches below the floor of the tank, an empty rivet-hole, five-eighths of an inch in diameter, running through the lower part of the iron bulk-head that divided the tank from the fire-room. The hole was down between the ribs, and about eight inches below the floor of the tank. During the voyage the water had risen two inches above the floor of the fire-room, and thirty-four inches above the bottom of the ship. The claimants contend that the water in the tank came from the fire-room, through the rivet-hole; that the rivet in the hole was loosened and fell out during the heavy weather; and that the water in the fire-room came from the seas shipped in the gale; both being perils of the seas, as they claim, for which the ship was not answerable.

*Butler, Stillman & Hubbard* and *Wm. Mynderse,* for libelants.

*Whitehead, Parker & Dexter,* for claimants.

BROWN, J., (*after stating the facts as above.*)  The evidence is not sufficient to determine with certainty how the water got into the tank.   If it came from the fire-room, through the rivet-hole, it could not have risen more than about 17 inches; while the ship's protest, made at Port de Paix, describes the tank as "filled with sea water," (an exaggeration, doubtless;) and the subsequent protest made in New York says that, while discharging cargo, "about 3 feet of water was found in the ballast tank." The first engineer testifies, moreover, that before arrival at Port de Paix the water in the fire-room had been all pumped out; and that there was then no water there except between the ship's ribs.   If the water entered the tank through the rivet-hole, it should have been discharged by the same aperture, as the fire-room was pumped out before reaching Port de Paix.   The only answer to this is the possibility that its egress may have got choked up.   The libelant contends, in view of this circumstance, that the more probable cause is that the cock by which the ballast tank was supplied with water had been more or less opened by accident, negligence, or mistake.   This cock was in the engine department, below the water-line.   It ran through the sides of the ship, and was turned by a crank.   A pipe led thence through the iron bulk-head down beneath the floor of the ballast tank into a small box, known as the "rose-box," between the ribs of the ship, where it ended.   This box was perforated with holes, to make it serve as a strainer, and was fastened by angle-irons on the outside, riveted into the bulk-head.   It was one of these rivet-holes that was afterwards found empty.   Water coming through the pipe and rose-box would make its way up through the floor of the tank, which was not water-tight, nor designed to be so.   The second engineer testifies that at Port de Paix he examined the pipes or valves leading to the water tank, and that, so far as he knew, they were all closed.   The first engineer says that at Port de Paix they were closed, "but whether they had been opened, or whether they had been leaking, it was not easy to tell." The engineer's log says the cock may have sprung a leak, or might have been opened by somebody.   Assuming, however, that the water entered through the empty rivet-hole, it is impossible not to treat this as a latent defect, considering that the cargo was stowed so low, and upon a floor not water-tight, where, in case of water coming into the engine compartment, it was likely to run into the tank, and injure the goods stowed there.   The subsequent examination showed no evidences of straining; nor is there any testimony that the weather was extraordinary.   The first protest stated that "nothing unusual occurred;" and the master, in his subsequent testimony, says that "the stoppage of the machinery was the only thing extraordinary."   I do not find any legal principle upon which the risk of such a defective riveting should be thrown upon the goods, and not upon the ship.   *Work* v. *Leathers*, 97 U. S. 379; *The Edwin I. Morrison*, 27 Fed. Rep. 136, 141, and cases there cited; *The Rover*, 33 Fed. Rep. 515.   Nor is the evidence sufficient to show that the water in the fire-room is attributable to "perils of the seas."   On the 28th, according to the engineer's log, the engine was stopped for $5\frac{1}{2}$ hours, to pack the steam gauge, which had sprung a leak; on the following day, for $1\frac{1}{2}$ hours,

in order to fasten the loosened seat of the feed-pump; on the 30th the pumps became foul, and the valves turned around; on the 29th the ship was rolling heavily, but no water, as the engineer says, was taken in from above. It rose two inches above the floor, as he says, "in consequence of the inexperience of the second engineer," who did not turn off the feed-cocks, as he should have done, when the engine stopped. On the 30th, or subsequently, some water came in from above through the open sky-lights; but it is plain from the engineer's testimony that this was not the principal cause of the accumulation of water below. Even if the repacking of the steam-gauge and repair of the pumps could be held to have been made necessary by sea perils, there is no reason to suppose that with reasonable care and skill those repairs need to have been attended by any such accumulation of water. The engineer's testimony clearly shows, as it seems to me, that this accumulation was caused through the mistake and inexperience of the second engineer, who before that trip had been only a fireman. He says that he had not been fully instructed. To bring the case within the excuse of sea perils, the ship was bound to show that this accumulation of water could not have been avoided by the use of reasonable skill and diligence. This is not made out, and the vessel must therefore, on both grounds, be held to the responsibility that the law casts upon her. Decree for the libelants, with costs.