**ATLANTIC TRANSPORT CO. OF WEST VIRGINIA et al. v. ROSENBERG BROS. & CO. et al.**

Circuit Court of Appeals, Ninth Circuit.
September 23, 1929.

No. 5757.

Ira S. Lillick and Lillick, Olson & Graham, all of San Francisco, Cal. (Ira S. Lillick and J. Arthur Olson, both of San Francisco, Cal., on the brief), for appellants.

Farnham P. Griffiths, Harold A. Black, and McCutchen, Olney, Mannon & Greene, all of San Francisco, Cal., for appellees.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

WILBUR, Circuit Judge. The appellees filed libels in personam to recover damages to their freight, carried by the Manchuria in her forward lower hold No. 1, and in No. 1 between decks, and No. 1 orlop deck, due to sea water entering these cargo spaces during a severe hurricane encountered by the Manchuria off the coast of Florida, from November 29 to December 3, 1925. The sea water from the forecastle entered the vessel through the anchor chain pipes, filled the chain locker, and flowed therefrom through an opening at the top of the chain locker, through which a main top deck beam passed. This opening through which the water escaped from the chain locker was approximately an inch in width extending around the beam, and plainly visible by inspection. The bill of lading exempted the owners of the vessel from injuries to the cargo, due to the unseaworthiness of the ship, where the owners had exercised due diligence to make the steamer seaworthy.

Such an exemption was permissible under the Harter Act. 27 Stat. 445, §§ 2, 3 (46 USCA §§ 191, 192).

The Manchuria was built in 1904. She was a large vessel, 616 feet in length, 65-foot beam, 26,700 tons displacement, equipped with reciprocating quadruple expansion engines, twin screws, with an average speed of 15½ knots per hour. She was built under a special survey of Lloyds'; her plans were prepared in compliance with Lloyds' rules, and any amendments considered necessary were made when the plans were submitted. During the construction, one of the surveyors of Lloyds' surveyed the construction, and reported that the ship was built in accordance with the plans and rules, and that everything was perfectly satisfactory. In pursuance of this report the Manchuria was given the highest Lloyds' classification and rating —100–A–1. She was also classified by the American Bureau of Shipping with their highest classification and rating—A–1–E. The vessel has been operated continuously since 1904, up to 1915, between San Francisco and the Orient, and from 1915 to 1922 she operated on the Atlantic Coast of the United States, and from that time, 1922, has been running between San Francisco and Atlantic Coast ports. During the period of the operations of this ship, covering nearly a quarter century, she has been repeatedly inspected and surveyed, to determine her seaworthiness, and has been passed as satisfactory. As late as 1924 she was given an extensive survey at New York by the American Bureau of Shipping, and it was reported, among other things: "Chain locker was examined, cleaned out, and relocated, and found satisfactory."

The defect relied upon in this case to establish the unseaworthiness of the ship, if defect it be, was at all times perfectly obvious. It appears from the evidence that great care is taken in the inspection of chain lockers; that inspectors enter the chain locker, and not only carefully examine the metal by tapping, but in case of doubt actually bore through the metal to ascertain whether it has been made dangerously thin by corrosion. While it is true that this attention is more particularly directed toward the bottom of the chain locker, where there is likely to be the most corrosion, and where there is greatest danger of water escaping, it is not likely that so patent a defect as the one claimed here would escape so careful an investigation. From this it must be apparent that the apertures in the upper part of the chain locker were not considered a defect. The chain lockers were 7 feet fore and aft, 11 feet athwart-

ships, and 43 feet deep, extending from the double bottom to the No. 1 middle between-deck. This was two decks below the forecastle, where the chain pipe, extending into the chain locker, received the anchor chain from the winch immediately above. The chain locker was immediately abaft the collision bulkhead, which formed its forward end. The chain locker contained 3,311 cubic feet, of which 1,500 cubic feet was occupied by the chain, so that until about 110 tons of water had entered the chain locker there would be no danger of an overflow through the aperture in question. Nine inches above the bottom in the after end of the chain locker a 3-inch lead drain pipe, its opening protected by a screen to prevent clogging, led from the chain locker to the bilge pump. It was recognized that in heavy seas the ship would take water on the forecastle, and to prevent this water entering the chain locker it was necessary to close the opening in the chain pipes. The ship was making her seventy-fourth voyage. The opening of the chain pipe was secured on this voyage in the same manner it had been customarily secured throughout the history of the ship. The mouth of the chain pipe protruded 4 inches through the base of the winch, which extended 9 inches above the deck. The chain pipe had a flange on its upper edge, a wooden cover 3½ inches thick, divided in the vertical plane in two sections, each section having a slot the depth of half the width of a link of the anchor chain, and wide enough to receive the 3⅛-inch anchor chain. One section was forced in from the after side, and the other from the forward side. The link of the anchor chain was about 10 inches in width, made of 3⅛-inch wrought iron and fitted with a stud, the link passing through the slot 10x3⅛ inches, partially filling the opening which was then packed with oakum and covered with cement. The lower 2½ inches of the plug was of the inner diameter of the chain pipe and fitted it snugly; the upper inch in thickness was of the diameter of the outer flange of the chain pipe; the shoulder made by this extension fitted snugly upon the top of the chain pipe, thus forming a cap. Where the lip extended over the chain pipe, oakum was packed between the lip and the pipe, and thereafter canvas was firmly secured beneath the lip of the chain pipe and gathered together about 12 inches above the top of the plug, securely laced to a link of the chain, and the lacing completely inclosed in cement. Under these conditions, it is obvious that only a very small amount of water, if any at all, could enter the chain locker from this source, unless the plug was carried

away. If, however, the plug carried away, it is testified that too heavy seas coming over the forecastle might completely fill the chain locker. One of these plugs was carried away during the hurricane which injured the libelant's goods, and it was by reason thereof that the chain locker was filled and overflowed, damaging the cargo.

In considering the question as to whether or not the owners had exercised due diligence in ascertaining the seaworthiness of their ship, it would seem at first blush, where the ship had been used continuously for 23 years without any record of such an injury, where she had been repeatedly inspected and favorably reported upon by disinterested inspectors, that this was the best possible evidence that the ship was entirely seaworthy, and when this fact is coupled with the added knowledge that the hurricane which damaged the cargo was of extraordinary violence, and one not likely to be encountered at that time of year, that due diligence had been exercised by the owners, and that the damage, under the circumstances, was due to the extraordinary violence of the storm.

The evidence is that, while hurricanes are to be expected in the West Indies during certain times of the year, such storms were not to be anticipated at this time of the year. It appears from the "American Practical Navigator," by Bowditch (1925, p. 228), printed by the United States government for the information of seamen, of which we may take judicial notice, Varcoe v. Lee, 180 Cal. 338, 343, 181 P. 223, that out of 234 hurricanes in the West Indies from 1870 to 1921 none occurred during December. Several of the witnesses testified that the storm in question was one of the most severe in their experience. The force of the wind was estimated at 100 miles per hour. The Manchuria passed through the center of the storm at 8:40 p. m. on December 2d; at 8 p. m. it was reported that the port chain pipe cover had carried away. Thereupon the engineers were ordered to pump out No. 1 bilge. They quickly cleared the chain locker of water, and it was kept dry from there to New York. The storm which injured the Manchuria's cargo was the one which struck the coast of Florida and did such great damage at Miami and Jacksonville.

In view of these circumstances, it is clear that the storm was of such violence and at such a time as to constitute a peril of the sea, exempting the shipowners from liability in the event that the ship was seaworthy. If the ship was not seaworthy within the meaning of the rule on that subject, so that the cargo was liable to be damaged by a storm of ordinary intensity, the fact that the particular storm which did the damage was of extraordinary violence would not exempt the owner from liability. The Turret Crown (C. C. A.) 297 F. 766; The Jeanie (C. C. A.) 236 F. 463; Compania de Navigacion La Flecha v. Brauer, 168 U. S. 104, 118, 18 S. Ct. 12, 42 L. Ed. 398; The Charles Rohde (D. C.) 8 F.(2d) 506, 507; The Rosalia (C. C. A.) 264 F. 285; The Bergenseren (D. C.) 36 F. 700; The Viking (C. C. A.) 271 F. 801.

The unusual situation in this case grows out of the fact that the owners and inspectors of the Manchuria for nearly a quarter of a century had relied upon her structural sufficiency to protect her passengers and cargo, and that no unusual precautions were taken on any voyage, because of danger from this aperture in the chain locker anticipated from extraordinary weather. In other words, it is apparent from the conduct of the owners and the surveyors that the ship was considered seaworthy for any sort of weather. If there were no other factors entering into the question of the liability of the owners, their freedom from responsibility would be reasonably clear; but the witnesses all recognize the probability of taking heavy seas on the forecastle, and that there is always a chance of such heavy seas carrying away or disturbing the chain pipe covering. It is recognized that there is always difficulty in securing this opening, not only because of the presence of the chain in the chain pipe passing through the wooden plug, but also because of the fact that the chain was not always in the same place, and therefore cannot always be fitted with equal security, and yet the method adopted at the time of leaving Havana on November 29, 1925, was the same as always had been used on the ship.

In 1920 the American Bureau of Shipping made a regulation that all chain lockers abaft the collision bulkhead must be made water-tight. This regulation was first published in pamphlet form in 1920. Lloyds' first published a similar rule in July, 1925. From the passage of these rules it is evident that these great organizations, dealing with the safety of passengers and cargo and ships, consider the water-tightness of the chain locker essential, where that chain locker is abaft the collision bulkhead, which would itself protect the cargo if the chain locker was forward of it. The question is whether the owners were justified in ignoring these rules devised for the safety of the ship and cargo.

A considerable part of the testimony is taken up with the consideration of whether or not such a rule is retroactive, but that interesting question does not particularly con-

cern us, because we have a continuing liability of the owner of the ship to furnish for each voyage a vessel reasonably fit to carry the cargo placed aboard her. If in 1920 or 1925 the concensus of opinion of the shipping world, by reason of experiences gained in the shipping industry, declared that the reasonable method of protecting the ship and its cargo from sea water entering into the chain lockers through the chain pipes was water-tightness of the chain locker, which would prevent the water going further, the duty of the owner in tendering his vessel as seaworthy must be measured with reference to that fact. The Titania (D. C.) 19 F. 101, 106; Adams v. Bortz (C. C. A.) 279 F. 521, 524; The Silvia, 171 U. S. 462, 19 S. Ct. 7, 43 L. Ed. 241; The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65; The Indrapura (C. C. A.) 190 F. 711. It is also true that in measuring the conduct of a shipowner it must be determined as of the date of his action, rather than by the light thrown on that action by subsequent evidence.

This is not a case where the structure of the ship has been wrenched or strained by an extraordinary storm. The evidence shows that the ship was subjected to such violent stresses and strains that the cogs in the shaft of her steering gear overrode each other, and that her rudder would no longer operate, and she had to be steered by her engines. If the injury had resulted because of such extraordinary strains, we would have a different situation. Here the injury resulted from the cause anticipated by these great organizations dealing with shipping before the event. Was the owner justified in ignoring these rules?

The testimony taken in this case shows that it is not an uncommon thing for water to enter the chain locker through the chain pipe. Some of the witnesses testified that it was a common thing. J. W. Jory, one of libelant's witnesses, a marine surveyor of the Board of Marine Underwriters, who had been going to sea about 25 years before he became a marine surveyor, testified: "I don't consider anybody can stop any time water getting into the chain locker. A chain locker cannot be properly secured to keep water out of it. In my experience I have had a chain locker filled in moderate weather, as well as in heavy gales. It is nothing unusual for a chain locker having water in it. It is not considered serious, with a ship fitted with a water-tight chain locker." He testified that in his opinion it would not take a gale of hurricane force to produce that result, but that with a deep-loaded vessel he had had water in its chain locker in moderate weather as well.

It appears from the evidence that the chain locker of the Manchuria could be made water-tight with a very small expense, $300 or $400, although some of the witnesses indicate that the incidental expense might be much heavier. This expense contemplates a permanent and perfect water-tight construction. There is no evidence in the case concerning the temporary means of rendering the chain locker water-tight. There is nothing to indicate, however, that this could not readily be accomplished. With the chain pipe full, the head of water above the opening would be very small, and the hydraulic pressure consequently slight. The experts who testified in the case differ in their conclusions. Appellees' witnesses, men of great experience in shipping, are of the opinion that the ship was not seaworthy, within the meaning of that rule, for the stowing of the dry cargo in the places occupied by the libelants' freight.

John T. Blakey, yard manager of a shipyard, with 34 years' experience in marine engineering, and a naval architect; Capt. Jory, shipmaster, surveyor of the Board of Marine Underwriters, 25 years' experience; A. L. Becker, consulting engineer in shipbuilding and allied trades; Mr. Hedstron, consulting naval architect, employed in ship construction for 30 years; David C. Young, chief surveyor of the Board of Marine Underwriters, 30 years' experience—all testified that in their opinion the construction of the chain locker of the Manchuria was such as to make her unseaworthy for the carriage of dry cargo in the forward hold.

Capt. McCauley, a member of the firm of Hibbs, McCauley & Smith, after 30 years' experience in the Navy, and having commanded vessels of all classes, expressed the opinion that the construction was proper and seaworthy, although a little unusual; that it would take very unusual weather and conditions, not to be anticipated, to dislodge the cover plates secured as the Manchuria's were. He testified that in his opinion the chain locker was of seaworthy construction, independent of the method of securing the cover plates. On cross-examination he testified as follows:

"Q. Have you ever designed a vessel with a chain locker abaft the collision bulkhead? A. No.

"Q. If you had such a vessel to design, would you make the chain locker water-tight? A. Yes.

"Q. I take it, then, your thought would be that it is better to have it water-tight than to leave it not water-tight? A. Yes; and it is

required both by the American Bureau and Lloyds' now under the rules.

"Q. In your judgment, this construction is not in compliance with Lloyds' rules as they now exist? A. It is not."

Mr. Heppell, a marine surveyor of San Francisco, who had served at sea for over 21 years, and as general manager of the National Shipping Corporation during the war, operating the fleet of the United States Shipping Board, but is now a marine surveyor in San Francisco, testified that he had examined the chain locker and its appliances on the Manchuria, and that in his opinion, with the chain pipe cover secured in the manner usual on the ship, that the chain locker and the vessel were seaworthy for carrying dry and perishable cargo in hold No. 1; that the washing away of the chain pipe covers would be a very unusual event, and that the three-inch suction line leading from the chain locker is ample to take care of any ordinary drainage which might get into the chain lockers through excessive water through the canvas covers or under the lashings.

David Millar, surveyor of Lloyds' Register of Shipping, testified that in his opinion the Manchuria was seaworthy, answering: "Yes; she was absolutely O. K. She had been carrying perishable cargo for 20 years, and when we meet a kind of weather that comes once in a while, we have other accidents on deck in other parts of the ship, as we do, which have been more efficiently secured." In his opinion it was unusual for a chain locker, such as the one on the Manchuria, to become completely filled with water.

Walter Gay, superintendent of the Bank Line Transport & Trading Company, who had been in command at sea for 20 years before coming ashore, testified that it was most unusual for a chain locker such as that on the Manchuria to become completely filled with water, and that, with the chain pipes properly secured, the Manchuria was seaworthy to carry a cargo in No. 1 hold.

Frank Evers testified that the Manchuria went through a number of typhoons while she was engaged in trade with the Orient, and that he never knew of any difficulty from water getting into the chain locker.

Other officers and employees of the ship testified as to the intensity of the storm, and gave their opinion that the ship was seaworthy for carrying the type of cargo she had.

One of these witnesses, Adolph G. Sturmhoffel, who had made seven trips on the Manchuria, and was her carpenter at the time of the accident, testified in detail as to the manner in which the chain pipes were secured, and that it had been secured in the same way it had been done for years. He was asked:

"In your experience, is it an unusual occurence when water gets into the chain locker? A. It is a common occurrence."

On redirect examination he testified that it was a common occurrence to get water in the chain locker the same way, "by covers washing off and filling up; my idea of ships in New York, it is a common thing to have the chain locker filled up; we have a drain there to run that water into the forepeak;" but that during his time the covers had never washed off the Manchuria's chain pipe.

The burden of proving due care in making the vessel seaworthy is upon the owners. The Jeanie (C. C. A.) 236 F. 463. There is a considerable weight of evidence tending to establish such care, such as long use of the ship, its immunity from difficulty in all sorts of weather, its careful construction, and repeated inspection. On the other hand, it is manifest from the testimony of all the witnesses that there is a possibility of water getting into the chain locker through the chain pipes; that in heavy weather there is always a chance of the chain pipe covers getting adrift from the constant pounding of the sea. It is obvious that the forces operating are never exactly the same, and that the chain pipe covering is never secured in exactly the same way.

In this instance we have one cover passing through the storm without serious injury, and the other completely destroyed. In addition to this fact, we have the opinion of the shipping world, expressed in most concrete fashion from 1920, so far as the American Bureau is concerned, and from July, 1925, so far as both Lloyds' and the American Bureau are concerned, that it is necessary to make the chain locker water-tight, where it is abaft the collision bulkhead. The owners neglected the precautions thus indicated as reasonable, and an injury resulted from the anticipated source of trouble. Under these circumstances, we cannot say that they met the burden of proving due diligence in making the vessel seaworthy.

It remains for us to consider one other factor in the problem. Assuming that water gets into the chain locker by reason of the breakage or dislodgment of the stoppers in the mouth of the chain pipe, we still have the opportunity of emptying the chain locker through the suction pipe. The appellant points to this as evidence that the ship was properly equipped to take care of the emergency which was encountered, and that the fact that the chain locker was quickly emp-

tied by the bilge pump, when it was ascertained it was full, is conclusive evidence that this means of protecting the cargo provided by the owner was amply sufficient. On the other hand, the appellees point out that the suction pipe might become clogged by mud brought into the chain locker with the anchor chain, and that when, in 1924, her chain locker was cleaned out, there was 15 bushels of mud in it. Captain McCauley testified that 15 bushels of mud might stop the drain pipe. It is true that that much mud packed up in front of the drain pipe might possibly stop it, but spread out over the bottom of the chain locker evenly, as it was likely to be, it would take at least 58 bushels of mud to reach the drain pipe 9 inches above the bottom, if the bottom were horizontal, and slanting upward, as the bottom does in the chain lockers of the Manchuria, it would probably take at least half of that amount—a good deal more than 15 bushels—to reach the drain pipe. Moreover, when the chain locker is full, the water would exert a pressure of over 20 pounds to the square inch at the drain pipe, and unless there was a very large amount of mud the suction of the pump, coupled with the pressure of the water above the suction pipe, would undoubtedly clear the chain pipe.

Under these conditions the appellants claim that the owner performed its full duty, providing equipment with which the crew could protect the cargo. But the question here is one of negligence, and it cannot be justly said under the circumstances that the crew was negligent, and where the owner has a perfectly simple method of protecting the cargo against the contingencies arising in heavy weather, is he justified in setting up the neglect of the officers and men of the ship to take care of the chain locker, where their whole attention is concentrated upon saving the ship from disaster? The officers and men of the ship apparently had constantly in mind the possibility of the ship's leaking, were taking soundings in other parts of the ship, and it was through these soundings they discovered that an unusual quantity of water was coming aboard, and the captain directed the soundings be taken in the chain locker, when it was discovered that it was full of water. Unless we are prepared to say that the officers were negligent in not sooner discovering this condition, when it is manifest that the skill of officers and men were being exercised to the utmost in the major problem of saving the ship, we cannot exculpate the owners for failing to make an alteration which would obviate this added anxiety and necessity for vigilance to the onerous burden already on the officers and men in handling so large a ship in a hurricane.

We refrain from setting forth in detail the damage to the ship. Suffice to say that 65 port lights were broken and other injuries sustained, not only indicating the severity of the storm, but the burdens placed upon the officers and men during the storm. The captain testified he had less than five hours' sleep in the trip from Havana to New York, occupying five days.

We have discussed the evidence somewhat fully, because of the fact that it was all taken before a referee or by deposition, but after careful examination we concur in the opinion of the District Court.

Judgment affirmed.