CALIFORNIA & HAWAIIAN SUGAR REFINING CORPORATION et al. v. RIDEOUT et al.

No. 6394.

Circuit Court of Appeals, Ninth Circuit.

Nov. 2, 1931.

S. Hasket Derby, Joseph C. Sharp, James A. Quinby, and Lloyd M. Tweedt, all of San Francisco, Cal., for appellant.

Lillick, Olson & Graham, of San Francisco, Cal., for appellee Rideout.

Gregory, Hunt & Melvin, T. T. C. Gregory, William H. Hunt, and Wallace Sheehan, all of San Francisco, Cal., for appellee Bay Transport Co.

Upon Appeal from the District Court of the United States for the Northern District of California, Southern Division.

Before WILBUR and SAWTELLE, Circuit Judges, and NETERER, District Judge.

SAWTELLE, Circuit Judge.

Involving two libels for the loss of a cargo of sugar and flour transported on the barge Rideout No. 7, this is an appeal from a decree of dismissal. The trial court found that failure to deliver was caused by the capsizing of the barge, which capsizing, in turn, was "proximately caused by the unexpected and 'freak' storm encountered in San Pablo Bay." In other words, the court below held that the appellee carriers were excused from liability because the existence of a "peril of the sea" had been established by them.

The libel of the California & Hawaiian Company is against both appellees for the failure to deliver 4,500 bags of refined sugar received on board the barge at Crockett, Cal., on May 25, 1929, destined for San Francisco. The libel of the Sperry Flour Company is limited to E. V. Rideout only; the Bay Transport Company, the other appellee, not being a party to the contract of affreightment. The Sperry Company's libel alleges that, also on May 25, 1929, it delivered 415 sacks of feed and 20 sacks of flour to the Rideout barge, at Vallejo, Cal., likewise for transportation to San Francisco.

Appellees admit the receipt and the nondelivery of the shipments, but urge as their defense a "peril of the sea." In addition, a special defense has been interposed by the appellee Bay Transport Company; namely, that the California & Hawaiian Corporation held a policy of insurance covering its shipment, and that such policy contained a rider under which the insurance company waived "all claims that it might have in law and equity against the Bay Transport Company for reimbursement of any losses paid to the assured." The waiver applied only to "shipments by steamers or barges the property of the Bay Transport Company."

The Bay Transport Company claims that the present action was instituted by the appellants on behalf of the Switzerland General Insurance Company, Limited, and "that the latter had endeavored to defeat the provisions of the bill of lading [as to the full benefit of insurance to be enjoyed by the carrier] by taking from the California & Hawaiian Sugar Refining Corporation a loan receipt, which is set forth in Libelants' Exhibit No. 10."

The special defense of the Bay Transport Company may be disposed of readily. In the first place, the insurance policy containing the rider relied upon was excluded from the record, and no cross-appeal complaining of such exclusion has been filed by the appellee. Secondly, the rider itself specifically provides, as we have seen, that it shall apply to shipments by vessels that are "the property of" the Bay Transport Company. To hold that the Rideout barge was the property of the Bay Transport Company, even so far as the California and Hawaiian Company's shipment, would not only be doing violence to both the legal and the popular acceptation of the term "property," but also

would be ignoring the holding of the court and the statements of the appellees themselves.

As a matter of fact, found by the lower court and not excepted to by the appellee, the Bay Transport Company was a party to the contract of affreightment, and in turn employed Rideout to transport the shipment to San Francisco. The court also found that the barge was the property of Rideout, notwithstanding certain vague language used by the trial judge during the discussion of the insurance policy during the argument. The appellee is foreclosed from now denying this basic fact, and claiming ownership of the barge and the tug.

■ Nor does physical ownership of the craft determine the Bay Transport Company's liability as a common carrier. The appellees' own reply brief establishes that fact:

"We can find no situation similar to these circumstances other than in the law applicable to connecting carriers. Under the Carmack Amendment to the Interstate Commerce Act, whenever an initial carrier accepts goods for shipment to a point on another line, it is conclusively treated as having made a through contract of shipment and will be liable for any loss or injury occurring on any connecting line over which the goods may pass. (49 USCA § 20.)

"It has been held in the decisions rendered under this amendment that the liability of the initial carrier is the same as if it owned a continuous line from the point of shipment to the point of destination and it makes the connecting carrier the agent of the initial carrier." Cases cited.

From the above, it will be seen that the initial carrier is liable for any loss occurring on any connecting line "as if it owned" a continuous line from the point of shipment to the destination, and the initial carrier is regarded as the principal and the connecting carrier as the agent. This statement clearly indicates that the principle involved is one of contractual responsibility, as contradistinguished from the question of the ownership of the physical instrumentalities by which the contract is carried out.

Adverting, then, to the major defense of "peril of the sea," we find that the carrier's responsibility is prescribed by statute (Harter Act § 3, 46 USCA § 192), as follows: "If the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel nor shall the vessel, her owner or owners, charterers, agent, or master be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service."

■ As a condition precedent to claiming the benefit of this statute, the carrier must prove that he and all his employees have exercised due diligence as to the seaworthiness, manning, equipment, and supplies of the vessel. This rule, with its full implications, was clearly expounded by Mr. Justice Day in The Southwark, 191 U. S. 1, 8, 13, 24 S. Ct. 1, 3, 48 L. Ed. 65, cited with approval in The Wildcroft, 201 U. S. 378, 389, 26 S. Ct. 467, 50 L. Ed. 794, and in Carlisle Packing Company v. Sandanger, 259 U. S. 255, 259, 42 S. Ct. 475, 66 L. Ed. 927.

"The effect of this [Harter] law is not to relieve the owner from the general duty of furnishing a seaworthy ship, but to limit his liability in certain particulars and upon the condition named in the statute. The Carib Prince, 170 U. S. 655, 18 S. Ct. 753, 42 L. Ed. 1181. Before the passage of the act, the initial obligation could be limited in certain particulars by special contract not involving negligence of the owner. Since the passage of the act, as to cases coming within its terms, before the owner can have the benefit of the relief provided by § 3 he must have exercised due diligence to provide a seaworthy vessel, capable of performing her intended voyage.
* * *

"As we have before stated, the right of the carrier to be exonerated in the respects named in the Harter Act [46 USCA §§ 190–195] depends upon the exercise of due diligence upon his part in discharging the primary duty of providing a seaworthy vessel. The burden of proof being upon the carrier to show that he has exercised due diligence to provide a seaworthy vessel at the time he received the meat and started upon the voyage, the question arises, Was this duty dis-

charged? 'This due diligence required,' said the Chief Justice, in delivering the opinion in International Navigation Company v. Farr & Bailey Manufacturing Company, supra [181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830], 'diligence to make the ship in all respects seaworthy; and that, in our judgment, means due diligence on the part of all the owners' servants in the use of the equipment before the commencement of the voyage and until it has actually commenced.' "

In The Feltre (C. C. A. 9) 30 F.(2d) 62, 64, Judge Gilbert used the following language: "To render available an exemption in a contract of carriage from absolute warranty of seaworthiness, the burden of proving the exercise of due diligence rests upon the shipowner, The Wildcroft, 201 U. S. 378, 26 S. Ct. 467, 50 L. Ed. 794, and it is not sufficient that the shipowner employs competent men to make the inspection. He is held accountable for the failure of the man he employs to discover patent defects, Int. Nav. Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830; The Manitoba (D. C.) 104 F. 145, 151; The Phœnicia (D. C.) 90 F. 118. Said Mr. Justice Holmes in The Germanic, 196 U. S. 589, 596, 25 S. Ct. 317, 318, 49 L. Ed. 610: 'But it is a mistake to say, as the petitioner does, that if the man on the spot, even an expert, does what his judgment approves, he cannot be found negligent. The standard of conduct * * * is an external standard, and takes no account of the personal equation of the man concerned.' In The Abbazia (D. C.) 127 F. 495, 496, Judge Adams said that the diligence required 'is diligence with respect to the vessel, not in obtaining certificates.' "

In Atlantic Transport Co. of West Virginia et al. v. Rosenberg Bros. & Co. et al. (The Manchuria) 34 F.(2d) 843, 845 (C. C. A. 9), Judge Wilbur said: "In view of these circumstances, it is clear that the storm was of such violence and at such a time as to constitute a peril of the sea, exempting the shipowners from liability in the event that the ship was seaworthy. If the ship was not seaworthy within the meaning of the rule on that subject, so that the cargo was liable to be damaged by a storm of ordinary intensity, the fact that the particular storm which did the damage was of extraordinary violence would not exempt the owner from liability. The Turret Crown (C. C. A.) 297 F. 766; The Jeanie (C. C. A.) 236 F. 463; Compania de Navigacion La Flecha v. Brauer, 168 U. S. 104, 118, 18 S. Ct. 12, 42 L. Ed. 398; The Charles Rohde (D. C.) 8 F.(2d) 506, 507; The Rosalia (C. C. A.) 264 F. 285; The Bergenseren (D. C.) 36 F. 700; The Viking (C. C. A.) 271 F. 801."

See, also, Dexter-Carpenter Coal Company v. New York, O. & W. Ry. Co. et al. (D. C.) 50 F.(2d) 270, 271, decided April 15, 1931, and Compania General de Tabacos de Filipinas v. United States (The Elkton), 49 F.(2d) 700, 701 (C. C. A. 2) decided May 4, 1931. In the latter case, Judge Learned Hand said: "When the owner accepts cargo in an unseaworthy ship, though the defect be such as may be neutralized by care, he imposes on the shipper an added risk; not merely that his servants may fail, in so far as she is sound and fit, but that they may neglect those added precautions which her condition demands. That risk the statute does not impose upon the shipper; he bears no loss until the owner has done his best to remove all risks except those inevitable upon the seas. It makes no difference whether the defect is in shell or hold; with her whole management the owner is charged unless he does his part."

It will thus be seen that the carrier has the burden of proof to establish due diligence before he can claim exemption from liability on the ground of danger of the sea, and the Harter Act is to be strictly construed against the carrier: "The act in question undoubtedly exempts from liability, where a shipowner has conformed to its requirements in making the vessel seaworthy, by the exercise of due diligence to properly equip, man, provision, and outfit it; but the terms of the act should be strictly construed as against a shipowner seeking exemption from liability, if he has failed to comply with its provisions. [Authorities cited.]" The Fort Morgan (C. C. A. 4) 284 F. 1, 4.

We next advert to the crucial question of whether or not Rideout Barge No. 7 was seaworthy, when the flotilla left Crockett in the early morning hours of May 26, 1929. A succinct and probably accurate account of the capsizing is to be found in the report prepared the next day by Capt. Frank Beggs, master of the tugboat Elaine, one of the respondents' witnesses.

Capt. Beggs wrote:

"On leaving the California & Hawaiian Sugar Refining Co., Crockett, on our regular trip to San Francisco, 3:30 a. m., May 26, 1929, with Barges E. V. R. No. 4 and No. 7, the weather was calm and mild and no swell, all was well until a mile below Oleum Wharf, a fresh N. W. breeze came up and continued

to increase until it reached a force of about 6 (Beaufort) with rising sea, we continued on our course. [Captain Beggs interpreted Beaufort 6 to be 36 miles an hour, but the Beaufort Scale itself, in the record as Libelants' Exhibit 7, gives "6" as being from 25 to 31 miles an hour.]

"The barges were making good weather, and in no apparent danger until abreast of Lt. By. No. 1, San Pablo Bay. We noticed Barge No. 7 taking a list to port. We immediately sounded the danger signal and ordered the crew of Barge No. 7 aboard Barge No. 4, which was in tow astern of Barge No. 7, this being at 5:45 a. m., and at 5:55 a. m. the barge gradually turned over, as we could not control the barge in the condition she was in, we cut her adrift at 6:03 a. m. At 6:10 a. m. we picked up Barge No. 4 and continued our voyage to Pier 19, San Francisco, where we notified the owner. Barge No. 7 contained 4,500 bags sugar, consigned to California & Hawaiian Sugar Refining Co., San Francisco, in addition to other miscellaneous freight."

While the appellants allege that Barge No. 7 was unseaworthy in several respects, such as in the alleged "missing forward hatch" and the allegedly inadequate fastening of the hawsepipe, we will consider only the most flagrant—the insufficient covering of the porthole. In doing so, we will rely in great measure upon the testimony of the appellees' own witnesses.

August H. Siemer, marine ways and ship repairer, who had been doing work for Rideout for 10 years prior to the trial, testified that No. 7 had "lights" or glasses in the portholes, of which the barge had several. Siemer added that, if the glasses had been missing, the repairers would have put them in, for that was their "business." His testimony clearly indicates he thought that glass should have been used in the porthole covering.

Yet Joe Andrade, captain of the barge, flatly denied ever having seen a glass in the porthole. Instead, he described in detail the quaint covering that he had devised for the aperture, as follows: "I put a doubled-up sack against the hole. * * * Then I put a board, that was what I call the plug—against the porthole. * * * I put wedges on * * * up and down, two up and two down * * * between the plank and the sheathing."

Asked why he used wedges instead of nails, Andrade replied that nails "are liable to come out, and the wedges never come out." Yet the barge foreman previously had testified that he "could not tell how many times" he had tightened the "plug" in the two and one-half years that he had been on the barge. He declared that the plug took "a little over a year to get loose."

As a matter of fact, the adequacy of such a "plug" would appear, even to a landlubber, quite indefensible. Capt. Joe W. Jory, a navigator of impressive seamanly qualifications, outlined the proper manner in which the porthole should have been closed: "Q. How do you think that hole should be closed? A. It should have been planked from the outside and water-tight battans or canvas nailed over, and planked, or else the planking on this particular section renewed and that hole done away with."

From ancient times the men who have had to go down to the sea in ships have held themselves to high accountability for care in making their craft fit to cope with the capricious elements. Though, as we have seen, the shipowner's liability has been limited by statute, such limitation in his favor is to be strictly construed against him, if he fails to prove his own diligence in making the vessel seaworthy.

The good sailor is the careful sailor. If he is negligent in the respects set forth in the Harter Act in guarding the goods and the lives intrusted to his care, he or his employer must pay. It is the law of the sea.

Decree reversed, with instructions to enter an interlocutory decree for appellants, referring the cause to a commissioner to ascertain the amount of the damages.